IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NORTHEASTERN DIVISION

FONZIE CRABTREE                    )
                                   )
v.                                 )    No. 2:05-0034
                                   )    Judge Wiseman/Brown
JO ANNE B. BARNHART, Commissioner  )
of Social Security                 )


To:  The Honorable Thomas A. Wiseman, Jr., Senior Judge


**REPORT AND RECOMMENDATION**

This is a civil action filed pursuant to 42 U.S.C. §405(g), to obtain judicial review of the final decision of the Commissioner of Social Security denying plaintiff disability insurance benefits ("DIB"), as provided under Title II of the Social Security Act ("the Act"), as amended. The case is currently pending on plaintiff's motion for judgment on the administrative record (Docket Entry No. 13), to which defendant has responded (Docket Entry No. 15). For the reasons stated below, the Magistrate Judge recommends that plaintiff's motion be **GRANTED**, and that the decision of the Commissioner be **REVERSED** and the cause **REMANDED** to the Commissioner for further administrative proceedings consistent with this report, to include supplementation of the record and the issuance of a new decision.

1

# I. INTRODUCTION

Plaintiff protectively filed an application for a period of disability and DIB on September 12, 2001, alleging that she had been disabled since July 1, 2000 (Tr. 52-55), due to severe neck, arm, shoulder, and back pain from spurs on her spine (Tr. 77). Plaintiff's application was denied initially (Tr. 29-30, 33-36) and upon reconsideration (Tr. 31-32, 38-39). A hearing was held before an Administrative Law Judge ("ALJ") on August 28, 2003 (Tr. 338-367), at which plaintiff appeared and testified, as did an impartial vocational expert ("VE"). Plaintiff was represented by counsel at the hearing.

On August 6, 2004, the ALJ issued a written decision denying plaintiff's claim for benefits. The ALJ made the following findings:

1. The claimant meets the nondisability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(i) of the Social Security Act and is insured for benefits through the date of this decision.

2. The claimant has not engaged in substantial gainful activity since her alleged onset, July 1, 2000.

3. The claimant has severe impairments as set forth in the Social Security Regulations. (20 CFR § 404.1520).

4. These medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

5. The undersigned finds the claimant's allegations regarding her limitations are not totally credible for the reasons set forth in the body of the decision.

2

6.  The claimant has the residual functional capacity for light work with limitations.

7.  The claimant is unable to perform any of her past relevant work. (20 CFR § 404.1565).

8.  The claimant is 46 years old which is defined as a "younger individual between the ages of 45 and 49" (20 CFR § 404.1563).

9.  The claimant has an eighth grade education and earned a GED in 2001. (20 CFR § 404.1564).

10. The claimant has no transferable skills from any past relevant work and/or transferability of skills is not an issue in this case. (20 CFR § 404.1568).

11. The claimant has the residual functional capacity to perform a significant range of light work. (20 CFR § 404.1567).

12. Although the claimant's exertional limitations do not allow her to perform the full range of light work, using Medical-Vocational Rule 202.18 as a framework for decision-making, there are a significant number of jobs in the national economy that she could perform. Examples of such jobs include the following: interviewers; messengers; and personal service.

13. The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision. (20 CFR § 404.1520(f)).

(Tr. 23).

On March 23, 2005, the Appeals Council denied plaintiff's request for review of the decision of the ALJ (Tr. 5-7), thereby rendering that decision the final decision of the Commissioner. This civil action was thereafter timely filed, and the Court has jurisdiction. 42 U.S.C. § 405(g). If the Commissioner's findings are supported by substantial evidence, based on the record as a whole, then these findings are

conclusive.  Id.

## II.  REVIEW OF THE RECORD

### A.  Medical Evidence

On March 10, 2000, nearly four months prior to her alleged onset date, plaintiff saw Dr. Joseph Jestus with complaints of neck pain radiating into both shoulders, more so on the right side (Tr. 152-153).  An MRI suggested a large cervical spondylytic[1] bulge on the left at C5-6 which did not appear significant (Tr. 152).  On examination, although plaintiff's reflexes were diminished, her motor exam was normal in all four extremities.  Dr. Jestus diagnosed plaintiff with cervicalgia, probably due to cervical spondylosis.[2]  Id.  Because plaintiff was not myelopathic,[3]  Dr. Jestus recommended that plaintiff undergo a myelogram[4] to rule out a high grade stenosis[5] (Tr. 152-153).

On March 14, 2000, pursuant to Dr. Jestus'

---

[1]Characterized by inflammation of the vertebrae.  Dorland's Illustrated Medical Dictionary (Dorland's), 30th Edition, p. 1742 (2003).

[2]Degenerative joint disease affecting the cervical vertebrae, intervertebral discs, and surrounding ligaments and connective tissue, sometimes with pain or paresthesia radiating along the upper limbs as a result of pressure on the nerve roots.  Dorland's, p. 1743.

[3]Characterized by any of various functional disturbances or pathological changes in the spinal cord. Dorland's, p. 1211.

[4]A radiograph of the spinal cord.  Dorland's, p. 1210.

[5]An abnormal narrowing of a duct or canal.  Dorland's, p. 1757.

4

recommendation, plaintiff underwent a cervical myelogram, which demonstrated an extradural[6] defect anteriorly at C5-6, with a retrolisthesis[7] of C5 on C6 (Tr. 144). In addition, a CT scan of plaintiff's cervical spine revealed a small disc protrusion centrally at the C5-6 level, causing only a mild spinal stenosis (Tr. 145). However, the neural foramina[8] and lateral recesses appeared normal. Id.

On March 20, 2000, Dr. Jestus reviewed plaintiff's myelogram and noted "absolutely no evidence of nerve root deformation, and her spondylosis appears much, much less significant on the myelogram as well" (Tr. 151). Dr. Jestus advised plaintiff that surgery would be ineffective, and he recommended, instead, continued conservative treatment. Plaintiff apparently inquired about disability benefits, however, Dr. Jestus expressed his uncertainty whether plaintiff would be qualified for such benefits. Id.

On April 4, 2000, plaintiff underwent an EMG for evaluation of bilateral hand complaints (Tr. 155). Plaintiff

---

[6]Situated outside the membrane covering the spinal cord. Dorland's, pp. 570, 659.

[7]Posterior displacement of one vertebral body on the subjacent body. Dorland's, pp. 1624-1625.

[8]A natural opening or passage through a nerve. Dorland's, pp. 721, 1251.

5

complained of pain in the ulnar[9] distribution in her left hand
which radiated along the lateral aspect of her forearm and
posterior aspect of her upper left arm. The EMG test results
provided no evidence for an ulnar neuropathy in either of the
plaintiff's arms. The study only provided evidence for a very
mild median neuropathy consistent with mild carpal tunnel
symptoms with no evidence of motor involvement. Id.

On April 27, 2000, plaintiff saw Dr. Ray Hester with
complaints of increased neck pain when putting her head back (Tr.
164). Although plaintiff's sensation was slightly decreased in
her left hand, her range of neck motion and reflexes appeared
satisfactory. Dr. Hester observed that plaintiff's previous
myelogram looked "pretty normal." Id. On June 8, 2000, Dr.
Hester advised plaintiff to try returning to work six hours per
day "for a week or two" (Tr. 163).

On June 22, 2000, plaintiff informed Dr. Hester that
she had been working six hours per day with increased pain in her
neck and right upper shoulder (Tr. 163). Plaintiff indicated
that her plant was closing down at the end of July, so she
intended on working full-time for the next month, and then quit
and return to school.[10] Id.

---

[9]Pertaining to the inner and larger bone of the forearm, on the side
opposite that of the thumb. Dorland's, pp. 1981-1982.

[10]It appears that "school" refers to the adult learning center where
plaintiff pursued and evidently obtained her GED (Tr. 83, 109, 342). It does
not appear that plaintiff was a full time student.

6

On August 15, 2000, plaintiff again saw Dr. Hester and indicated that she had worked for one month, quit her job, and was currently trying to go to school (Tr. 162). Recently, however, plaintiff took tests for five hours and experienced pain down the back of both arms. Dr. Hester advised plaintiff not to work with her arms out in front of her while standing, to avoid bending from the waist, and to avoid lifting over 5-10 pounds "at this point." Id.

On March 11, 2001, plaintiff visited Fentress County General Hospital with complaints of headache pain (Tr. 190). Following evaluation, plaintiff was diagnosed with a migraine headache. Id. On July 29, 2001, plaintiff complained of low back pain after lifting her grandchildren earlier that day (Tr. 178). Plaintiff was diagnosed with a lumbar strain. Id. Two months later, on October 7, 2001, plaintiff complained of experiencing low back pain the previous 3-4 days, which was presently worsening, with radiation down her legs (Tr. 174).

On November 21, 2001, plaintiff saw Dr. William Sewell for a clinical interview and mental status examination (Tr. 191-193). Dr. Sewell observed that plaintiff "moved about with unrestricted mobility" and "exhibited no physical limitations" (Tr. 191). Specifically, plaintiff used both hands and arms freely as she manipulated materials. Id. Mentally, plaintiff stated that she "gets depressed every now and then when pain gets

7

bad and she can't do what she wants to do," approximately one time out of every 2-3 weeks (Tr. 191-192). Following his examination of plaintiff, Dr. Sewell diagnosed plaintiff with adjustment disorder with depression (Tr. 192).

On December 5, 2001, plaintiff saw Dr. Donita Keown for a consultative physical examination (Tr. 194-196). Dr. Keown observed that plaintiff demonstrated no difficulty ambulating, even though she wore 2-inch heels (Tr. 195). Plaintiff had full range of motion over both shoulders, elbows, wrists, hands, hips, knees, and ankles, and straight leg raising signs were negative[11] (Tr. 196). Plaintiff's bilateral hand, arm, and leg strength was full. Dr. Keown indicated that, although plaintiff experienced discomfort with anterior flexion,[12] she had excellent range of cervical spine motion. Dr. Keown further noted that plaintiff's past problems with irritable bowel syndrome were stable. Concluding, Dr. Keown opined that plaintiff could sit at least 6 hours in an 8-hour work day, could stand 6 hours in an 8-hour work day, and could routinely lift 10 pounds and 20 pounds episodically. Id.

---

[11]Straight leg-raising (SLR) tests are designed to detect nerve root pressure, tension, or irritation of the sciatic nerve. With the knee fully extended, the physician raises the involved leg from the examination table. A positive SLR test requires reproduction of pain at an elevation of less than 60 degrees, and is the single most important sign of nerve root pressure produced by a herniated disc. Gunnar Andersson and Thomas McNeill, Lumbar Spine Syndromes: Evaluation and Treatment 35, 78-79 (1989).

[12]The act of bending forward. Dorland's, pp. 97, 710.

8

On December 14, 2001, a Disability Determination Services (DDS) examiner reviewed plaintiff's records and completed a Psychiatric Review Technique form (PRTF) (Tr. 199-212). The DDS examiner addressed whether plaintiff met or equaled Listing 12.04 of the Listing of Impairments, 20 C.F.R. § 404, Subpart P, App. 1, which deals with affective disorders (Tr. 202). Under the "A" criteria of Listing 12.04, the examiner determined that plaintiff had a medically determinable impairment that did not precisely satisfy the diagnostic criteria; specifically, adjustment disorder. Id. However, under the "B" criteria, the examiner found only mild restrictions of activities of daily living; mild difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation (Tr. 209). The DDS examiner also completed a Mental Residual Functional Capacity Assessment (MRFC) on December 14, 2001 (Tr. 213-216). The examiner found that plaintiff had no more than moderate limitations in all categories (Tr. 213-214).

On December 21, 2001, Dr. Robert Burr, a DDS physician, completed a Physical Residual Functional Capacity Assessment (Tr. 217-224), in which plaintiff was found capable of lifting 50 pounds occasionally and 25 frequently; standing and/or walking about 6 hours in an 8-hour workday; sitting about 6 hours in an 8-hour workday; and pushing and/or pulling to an unlimited degree

9

(Tr. 218).

On June 10, 2003, plaintiff's treating physician, Dr. Jonathon Allred, completed a Medical Source Statement of Ability to do Work-Related Activities (Physical) form (Tr. 284-287). On this form, Dr. Allred opined that plaintiff was capable of lifting 20 pounds; could stand or walk at least 2 hours in an 8-hour work day, could sit "less than about 6 hours in an 8-hour work day," and had some limitations in her ability to push and/or pull with her extremities (Tr. 284-285). Dr. Allred further indicated that plaintiff could occasionally climb, balance, kneel, crouch, crawl, and stoop; could frequently reach, handle, finger, and feel; and had some limitations caused by temperature extremes, vibration, humidity/wetness, and hazards (Tr. 286-287).

During examinations on March 30, and July 22, 2003, Dr. Allred noted that plaintiff had 5/5 motor strength in all four extremities and full range of motion, moved her extremities well, and had intact cranial nerves throughout (Tr. 309, 311). On the latter date, however, plaintiff was admitted for a colonoscopy[13] due to complaints of abdominal pain (Tr. 308-309).

B. Hearing Testimony and Other Evidence

At the time of her administrative hearing, plaintiff was 45 years of age (Tr. 341), had formal education through the

---

[13]Examination of the entire colon by means of an elongated flexible instrument. Dorland's, pp. 392, 616.

10

eighth grade with attainment of a GED (Tr. 83, 342), and had past relevant work experience as a sewing machine operator (Tr. 78, 96-99, 342). Regarding her activities of daily living, plaintiff indicated that she was limited by her pain, specifically while standing for any length of time, but was able to do some cooking, cleaning, dishwashing, laundry, and visiting with relatives outside her home (Tr. 104-111, 358-59). She also made her bed every day (Tr. 107), attended church regularly, sang in the church choir, watched television, and read once in a while (Tr. 358-59).

Testifying as an impartial VE, Dr. Gary Sturgill was asked to consider the availability of light and sedentary work[14] for an individual with plaintiff's age, education, and past work experience who is capable of walking and standing for 6 hours out of an 8-hour work day; has a limited pushing and pulling capacity in her upper extremities; is limited in her ability to work with her arms extended; is moderately limited in her ability to grip; is precluded from climbing ladders, ropes, or scaffolds; can occasionally balance, stoop, bend, kneel, crouch, crawl, and climb stairs and ramps; and should avoid extremes in temperature, dampness, wetness, humidity, fumes, odors, dust, and gases (Tr.

---

[14]Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds; sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. 20 C.F.R. § 404.1567(a)-(b).

Case 2:05-cv-00034   Document 16   Filed 12/22/05   Page 11 of 21 PageID #: 41

364).

In response, the VE stated that such an individual would be capable of performing the following jobs, each of which existed at both the light and sedentary exertional levels: interviewer, messenger, and personal service occupations (Tr. 364-365). At the light level, the interviewer occupation offered approximately 1,500 jobs in Tennessee and 68,000 nationally; messenger, 2,000 jobs in Tennessee and 120,000 nationally; and personal service occupations, 1,600 in Tennessee and 90,0000 nationally. At the sedentary level, the interviewer occupation offered 600 jobs in Tennessee and 23,000 nationally; messenger, 500 in Tennessee and 7,000 nationally; and personal service occupations, 300 in Tennessee and 5,500 nationally. Id.

The ALJ further inquired whether a moderate limitation in one's concentration, persistence, and pace due to intermittent pain and discomfort would affect the number of these jobs (Tr. 365). The VE testified that such a moderate limitation would not preclude performance of the jobs to which he had previously testified. Id.

### III. CONCLUSIONS OF LAW

#### A. Standard of Review

This Court's review of the Commissioner's decision is limited to the record made in the administrative hearing process.

<u>Jones v. Secretary</u>, 945 F.2d 1365, 1369 (6th Cir. 1991).  The
purpose of this review is to determine (1) whether substantial
evidence exists in the record to support the Commissioner's
decision, and (2) whether any legal errors were committed in the
process of reaching that decision.  <u>Landsaw v. Secretary</u>, 803
F.2d 211, 213 (6th Cir. 1986).

"Substantial evidence" means "such relevant evidence as
a reasonable mind would accept as adequate to support the
conclusion." <u>Her v. Commissioner</u>, 203 F.3d 388, 389 (6th Cir.
1999)(<u>citing</u> <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971)).
It has been further quantified as "more than a mere scintilla of
evidence, but less than a preponderance." <u>Bell v. Commissioner</u>,
105 F.3d 244, 245 (6th Cir. 1996).  Even if the evidence could
also support a different conclusion, the decision of the ALJ must
stand if substantial evidence supports the conclusion reached.
<u>Her</u>, 203 F.3d at 389 (<u>citing</u> <u>Key v. Callahan</u>, 109 F.3d 270, 273
(6th Cir. 1997)).  However, if the record was not considered as a
whole, the Commissioner's conclusion is undermined.  <u>Hurst v.</u>
<u>Secretary</u>, 753 F.2d 517, 519 (6th Cir. 1985).

B.  <u>Proceedings at the Administrative Level</u>

The claimant has the ultimate burden to establish an
entitlement to benefits by proving his or her "inability to
engage in any substantial gainful activity by reason of any
medically determinable physical or mental impairment which can be

13

expected to result in death or which has lasted or can be

expected to last for a continuous period of not less than 12

months." 42 U.S.C. § 423(d)(1)(A). At the administrative level

of review, the claimant's case is considered under a five-step

sequential evaluation process, as follows:

(1) If the claimant is working and the work constitutes
    substantial gainful activity, benefits are automatically
    denied.
(2) If the claimant is not found to have an impairment which
    significantly limits his or her ability to work (a "severe"
    impairment), then he or she is not disabled.
(3) If the claimant is not working and has a severe impairment,
    it must be determined whether he or she suffers from one of
    the "listed" impairments[15] or its equivalent; if a listing is
    met or equaled, benefits are owing without further inquiry.
(4) If the claimant does not suffer from any listing-level
    impairments, it must be determined whether the claimant can
    return to the job he or she previously held in light of his
    or her residual functional capacity (e.g., what the claimant
    can still do despite his or her limitations); by showing a
    medical condition that prevents him or her from returning to
    such past relevant work, the claimant establishes a <u>prima
    facie</u> case of disability.
(5) Once the claimant establishes a <u>prima</u> <u>facie</u> case of
    disability, it becomes the Commissioner's burden to
    establish the claimant's ability to work by proving the
    existence of a significant number of jobs in the national
    economy which the claimant could perform, given his or her
    age, experience, education, and residual functional
    capacity.

<u>Moon v. Sullivan</u>, 923 F.2d 1175, 1181 (6th Cir. 1990).

    The Commissioner's burden at the fifth step of the

evaluation process can be carried by relying on the medical-

vocational guidelines, otherwise known as "the grid," but only if

---

[15] The Listing of Impairments is found at 20 C.F.R., Pt. 404, Subpt. P,
Appendix 1.

14

the claimant is not significantly limited by a nonexertional impairment, and then only when the claimant's characteristics identically match the characteristics of the applicable grid rule. Otherwise, the grid can not be used to direct a conclusion, but only as a guide to the disability determination. Id. In such cases where the grids do not direct a conclusion as to the claimant's disability, the Commissioner must rebut the claimant's prima facie case by coming forward with particularized proof of the claimant's individual vocational qualifications to perform specific jobs, which is typically obtained through vocational expert (VE) testimony. See Varley v. Secretary, 820 F.2d 777, 779 (6th Cir. 1987).

In determining residual functional capacity (RFC) for purposes of the analysis required at steps four and five above, the Commissioner is required to consider the combined effect of all the claimant's impairments, mental and physical, exertional and nonexertional, severe and nonsevere. See 42 U.S.C. § 423(d)(2)(B).

C. Plaintiff's Statement of Errors

Plaintiff contends that the ALJ erred by failing to credit the assessments of her treating physicians, or by failing to adequately explain his rejection of those assessments. Plaintiff further contends that the ALJ erred in failing to assess her limitations from chronic headaches, and in failing to

15

consider her sitting limitations.  Finally, plaintiff contends
that the ALJ erred by failing to inquire of the VE whether his
testimony to jobs existing in the economy was in accordance with
the Dictionary of Occupational Titles ("DOT").

     With respect to the last argument, it is clear that the
ALJ may properly rely on vocational expert testimony that is in
conflict with the DOT.  <u>Wright v. Massanari</u>, 321 F.3d 611, 616
(6th Cir. 2003).  The only requirement imposed upon the ALJ in the
face of such a conflict is to explain the resolution of that
conflict, if such resolution is not apparent from the testimony
itself.  Soc. Sec. Rul. 00-4p, 2000 WL 1898704, *2 (S.S.A. Dec.
4, 2000).  As defendant notes in her brief, plaintiff's counsel
has raised this point of error without identifying any perceived
conflict with the DOT in her brief or at plaintiff's hearing, and
without even questioning the VE at the hearing.  Therefore, this
argument is without merit.

     However, the ALJ's decision does not otherwise
sufficiently address the points touched on in plaintiff's brief.[16]
While there is evidence in the record (<u>e.g.</u>, the reports of the
consulting examiners[17]) that would tend to support the ALJ's

_____

     [16]The undersigned would note that he is thoroughly unimpressed with
counsel's three-page brief, which was filed out of time and does not cite a
single case.

     [17]The ALJ's summaries of the reports of these two consultants are
prefaced with the phrases "Concerning the claimant's credibility..." and "In
regard to the claimant's credibility..." (Tr. 18, 20).  However, these
introductory phrases and the existence of these less restrictive assessments

16

ultimate conclusion, the lengthy narrative decision does not contain a true rationale for his partially adverse credibility finding, but merely gives a recitation of the medical evidence followed by the notation that he "finds it important that [the doctor whose notes and findings were summarized] did not find the claimant disabled and did not prohibit her from working." (Tr. 17, 18, 20). It is implicit in his RFC finding, as well as in his solicitation of VE testimony as to the existence of sedentary work (Tr. 364), that the ALJ rejected the assessment by plaintiff's primary treating physician, Dr. Allred, that plaintiff could stand/walk for at least two out of eight hours, sit for less than six out of eight hours, and required a sit/stand option to alleviate pain (Tr. 285); however, the ALJ did not explicitly identify any reason for rejecting these limitations and others described in Dr. Allred's assessment, while accepting certain other limitations also described therein.[18] This alone is reversible error, even in the face of

_____

alone are not sufficient to support the finding that "claimant is a credible witness regarding her inability to do some types of work ... [but] is not fully credible regarding her allegations of being unable to do any type of work." (Tr. 16). As discussed infra, the regulations prescribe a standard for evaluating the credibility of subjective complaints which the ALJ is bound to employ, and which precludes his reliance on solely objective medical proof.

[18]Dr. Allred assessed the following limitations: able to lift/carry 20 pounds occasionally; able to stand/walk at least 2 hours out of 8; able to sit less than about 6 hours out of 8; requiring a sit/stand option; limited pushing/pulling capabilities in upper and lower extremities; limited to occasional climbing, balancing, kneeling, crouching, crawling, and stooping; limited from constantly reaching, handling, and fingering; and limitations against exposure to temperature extremes, vibration, humidity/wetness, and hazards such as machinery and heights.
    In contrast, the ALJ found, but did not explain by reference to record

17

otherwise substantial evidence supporting the denial of benefits.
Wilson v. Comm'r of Soc. Sec., 378 F.3d 541, 544-48 (6ᵗʰ Cir.
2004); see Soc. Sec. Rul. 96-2p, 1996 WL 374188, at *5
(1996)(stating that a decision denying benefits "must contain
specific reasons for the weight given to the treating source's
medical opinion, supported by the evidence in the case record,
and must be sufficiently specific to make clear to any subsequent
reviewers the weight the adjudicator gave to the treating
source's medical opinion and the reasons for that weight.").

    The ALJ did make some findings amidst his recitation of
medical evidence, specifically noting that plaintiff stopped
working because her employer closed, and that she reported
attending school after she stopped working (Tr. 18). He further
finds that the reoccurring ailments treated by Dr. Allred,
including irritable bowel syndrome, back pain, headaches, and
neck pain, "have responded to treatment and are managed with
medication." (Tr. 19). This latter finding brings home the fact
that plaintiff's primary alleged obstacle to employment is her
pain, yet despite making passing reference to the pain standard

---

evidence, the following limitations on plaintiff's ability to perform the full
range of light work: able to walk/stand up to 6 hours out of 8; limited
ability to push/pull with upper extremities; limited ability to grip; no
climbing of ladders; and no exposure to temperature extremes, dampness,
wetness and humidity or fumes, odors, dust, and gases. (Tr. 15). While the
government argues that these two RFC assessments are "strikingly similar"
(Docket Entry No. 15, p. 13), the differences regarding plaintiff's capacity
for sitting, standing, and walking are critical to the determination of RFC
under the regulations and rulings.

contained in the regulations (Tr. 15), 20 C.F.R. § 404.1529, the
ALJ does not analyze plaintiff's pain complaints pursuant to that
standard. There are references in the record to objective
indicia of pain, specifically palpable, chronic muscle spasms in
the trapezius area (e.g., Tr. 247, 291, 301), and the medication
which the ALJ found to manage plaintiff's pain has consistently
included Vicodin, hydrocodone, or other narcotic agents. While
non-steroidal anti-inflammatory medications are apparently
contraindicated due to plaintiff's gastrointestinal problems and
plaintiff is otherwise allergic to aspirin and sulfa drugs (e.g.,
Tr. 308), the use and side effects of narcotic medications bear
some mention in assessing the credibility of pain complaints, as
does the objective medical evidence of pain and plaintiff's
testimony to daily activities and other areas of limitation. See
Walters v. Comm'r of Soc. Sec., 127 F.3d 525, 531 (6ᵗʰ Cir. 1997);
Felisky v. Bowen, 35 F.3d 1027, 1037-41 (6ᵗʰ Cir. 1994); 20 C.F.R.
§ 404.1529(c). The ALJ's opinion does not even mention the
testimony of plaintiff at the hearing.

Moreover, the hearing transcript suggests that the ALJ
may have dismissed plaintiff's headaches as self-inflicted, in
that they are related to drinking too much coffee, or caused by
caffeine withdrawal when she does not drink coffee (Tr. 361).
The following colloquy took place:

Q    ...Now, you mentioned the coffee in the morning.

19

How much coffee in a day?

A     About two pots.

Q     Well, now we know --

A     Too much.

Q     -- about the gastric problems.  I imagine your
       doctors have talked to you about this a great
       deal.

A     Yes.

Q     And the headaches, too.  Haven't –

A     But if I don't drink the coffee, I still have the
       headaches.

Q     Well, it's the withdrawal, of course.  That's
       what's happening is you don't get the regular fix.

       ...

(Tr. 361).  However, it does not appear from the medical evidence
that plaintiff's headaches have ever been attributed to her
caffeine intake.  Plaintiff further testified that while her
doctors occasionally advise her to quit smoking, they have not
asked her to limit her coffee consumption (Tr. 362).

       In short, pursuant to the law of this Circuit and the
Commissioner's own regulations, the ALJ's failure to give any
reasons for his rejection of portions of Dr. Allred's assessment
and his failure to properly analyze plaintiff's subjective pain
complaints require reversal of the Commissioner's decision.

## IV. RECOMMENDATION

In light of the foregoing, the Magistrate Judge recommends that plaintiff's motion for judgment on the administrative record be **GRANTED**, that the decision of the Commissioner be **REVERSED**, and that the cause be **REMANDED** for further administrative proceedings consistent with this report, to include supplementation of the record and the issuance of a new decision.

Any party has ten (10) days from receipt of this Report and Recommendation in which to file any written objections to it with the District Court. Any party opposing said objections shall have ten (10) days from receipt of any objections filed in which to file any responses to said objections. Failure to file specific objections within ten (10) days of receipt of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation. Thomas v. Arn, 474 U.S. 140 (1985); Cowherd v. Million, 380 F.3d 909, 912 (6th Cir. 2004)(en banc).

**ENTERED** this 20th day of December, 2005.


  /s/ Joe B. Brown
JOE B. BROWN
United States Magistrate Judge

Case 2:05-cv-00034   Document 16   Filed 12/22/05   Page 21 of 21 PageID #: 51